*This opinion is subject to revision before
publication in the Pacific Reporter*

**2015 UT 18**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

GLENN HOWARD GRIFFIN,
*Appellant.*

No. 20090520
Filed January 30, 2015

First District, Brigham City
The Honorable Ben H. Hadfield
No. 051100219

Attorneys:

Sean D. Reyes, Att'y Gen., John J. Nielsen, Asst. Att'y Gen.,
Salt Lake City, for appellee

Jennifer Gowans Vandenberg, Park City, for appellant

ASSOCIATE CHIEF JUSTICE NEHRING authored the opinion of
the Court, in which CHIEF JUSTICE DURRANT, JUSTICE DURHAM,
JUSTICE PARRISH, and JUSTICE LEE joined.

ASSOCIATE CHIEF JUSTICE NEHRING, opinion of the Court:

## INTRODUCTION

¶ 1   The current case comes before this court both as a direct appeal of Glenn Howard Griffin's conviction for first-degree murder and through motions to remand under rules 23 and 23B of the Utah Rules of Appellate Procedure.  We deny Mr. Griffin's motion under rule 23.  However, we grant his rule 23B motion in part and remand to the trial court to enter findings of fact necessary to evaluate Mr. Griffin's ineffective assistance of counsel claims on appeal.  We therefore stay Mr. Griffin's direct appeal pending the trial court proceedings.

**BACKGROUND**

¶ 2   On May 26, 1984, Bradley Newell Perry was working as a night clerk at a Texaco gas station in Box Elder County, Utah.  At some point during the night, one or more individuals entered the store and attacked Mr. Perry.  Mr. Perry was tied up, stabbed, and beaten.  He died as a result of his wounds.  Approximately $100 in cash was taken from the register of the convenience store.

¶ 3   Sometime after midnight, two students, Ali Sabbah and Baseem Barish, pulled up to the Texaco station for gas.  Though the Texaco was a self-service station, a man came out of the store and offered to help the students pump gas.  Mr. Sabbah described the man as being about six feet tall and lean, with black hair and a scruffy beard.  He guessed the man was approximately thirty years old.  Mr. Barish similarly described the man as around six feet tall with black eyes and black hair.

¶ 4   While the man was pumping gas, Mr. Sabbah noticed that the man had bruises on his hand and there was what looked like dried blood on his clothes and fresh blood on his white shoes.  Mr. Sabbah paid the man with five one-dollar bills.  At that point, Mr. Barish started walking towards the store to buy cigarettes.  The man intercepted Mr. Barish and said he would get the cigarettes for him.  Mr. Barish paid for the cigarettes with a five-dollar bill, and the man gave him back four of the one-dollar bills as change.  Mr. Barish noticed that one of the bills had what appeared to be a fresh bloodstain on it, and he thought that the man seemed nervous.  After the students left the gas station, they discussed the strange interaction with the man.   Mr. Barish showed Mr. Sabbah the bloody one-dollar bill and placed the bill on the dashboard.  Concerned about the encounter, the students sped down the road in an attempt to get pulled over.  When that failed, they found a payphone and called the police.

¶ 5   Detective Alan Beard arrived at the students' location and escorted them back to the police station in Brigham City.  The students relayed what they had seen and gave Detective Beard the pack of cigarettes purchased at the station and the four one-dollar bills they received as change.  Mr. Sabbah sketched two drawings of the man at the gas station.

¶ 6   Sheriff Lynn Yates, a patrol officer at the time, responded to the gas station, arriving at approximately 4:30 a.m.  He and Officer Danny Earl entered the store through the public entrance

and noticed a blood trail leading to a storage room, which was locked. Sheriff Yates went around the back of the building and looked through a window into the storage area, where he saw Mr. Perry's body lying on the ground. Sheriff Yates and Officer Earl then kicked open the locked storage door. Sheriff Yates determined that Mr. Perry was dead and called for the investigation team.

¶ 7 The murder scene showed evidence of a struggle. Mr. Perry's body was covered in bruises and defensive wounds, and his hands were bound behind his back with an electrical cord. The autopsy report showed that Mr. Perry had various injuries. The cause of death was certified as blunt-force injury to the head and neck along with multiple stab wounds. The head injury was likely caused by a syrup canister found in the store. Additionally, approximately $100 was missing from the cash register.

¶ 8 Following the murder, police investigated a number of leads, developing a list of approximately two hundred potential suspects. Police considered Thomas Nager, an employee at the station, and Mr. Nager's friend, Craig Martinez, to be primary suspects. The lead detective on the case explained that he believed the perpetrator was someone familiar with the store, and he testified that Mr. Sabbah had identified Mr. Nager from a photo lineup as being "consistent with" the man he had seen at the gas station. Police also received information from Michael Caldwell, a friend of Mr. Nager and Mr. Martinez. Mr. Caldwell implicated Mr. Nager and Mr. Martinez in the murder, but his story was inconsistent and changed during conversations with the police. At Mr. Griffin's trial, Mr. Nager admitted that he sold drugs out of the store, he was late for work on the morning after the murder, he stole from the store and was fired when the manager discovered his theft, and he had multiple felony convictions.[1] Mr. Nager also claimed that he heard from others that Mr. Martinez had bragged about killing Mr. Perry. Ultimately, however, no DNA evidence connected Mr. Nager or

---

[1] Mr. Martinez asserted his intention to invoke his Fifth Amendment right not to incriminate himself if he was called to testify at trial. The parties therefore stipulated that Mr. Martinez was "unavailable" under Utah Rule of Evidence 804.

Mr. Martinez to the murder, and neither man was charged. The case went cold for several years.

¶ 9   Mr. Griffin became a suspect in 2005 when DNA from the blood-stained one-dollar bill was matched to him. Investigators then tested hair samples that were collected from the murder scene for mitochondrial DNA (mtDNA) and determined that 99.94 percent of the population could be excluded as the donor but Mr. Griffin could not. Additionally, a fellow inmate of Mr. Griffin's, Benjamin Britt, told police that Mr. Griffin made incriminating statements about the murder to him while they were in prison together.

¶ 10   The State charged Mr. Griffin with first-degree murder under Utah Code section 76-5-202 (1984),[2] and a jury convicted him. The State sought the death penalty, but the jury returned a sentence of life without parole. Mr. Griffin timely appealed. Mr. Griffin also filed motions to remand under Utah Rules of Appellate Procedure 23 and 23B. We deferred consideration of those motions in order to address the claims in conjunction with the issues raised on his direct appeal.

## ANALYSIS

¶ 11   We first consider Mr. Griffin's rule 23 motion for remand to supplement the record on appeal. We determine that this relief cannot be granted under rule 23, and we therefore deny the motion. We next address Mr. Griffin's rule 23B motion and conclude that, for certain claims, he alleges sufficient facts that could support a finding of ineffective assistance of counsel. We therefore grant the motion in part and temporarily remand to the trial court for the entry of findings of fact. We stay a ruling on Mr. Griffin's direct appeal pending the outcome of the trial court proceeding.

### I.  MOTION UNDER RULE 23

¶ 12  Mr. Griffin alleges that a number of errors occurred during trial for which there is no evidence on record. He therefore requests that we remand his case under rule 23 of the

---

[2] Mr. Griffin was also charged with aggravated robbery under Utah Code section 76-6-302 (1984), but that charge was later dismissed by stipulation of the parties as time barred.

Utah Rules of Appellate Procedure to make findings on claims regarding a conflict of interest with counsel, inadequate compensation for counsel, and the State's failure to preserve evidence for testing by the defense.

¶ 13 Mr. Griffin cites no authority that permits this court to grant his requested relief under rule 23. Rule 23 merely governs the form of motions; it does not grant parties any substantive rights.[3] Mr. Griffin therefore cannot base his motion to supplement the record on rule 23 alone. The rules do provide two mechanisms to supplement the record for appeal. Under Utah Rule of Appellate Procedure 11(h), a party may make a "correction" or "modification" to the record in circumstances when "any difference arises as to whether the record truly discloses what occurred in the trial court" or if "anything material to either party is misstated or is omitted from the record by error [or] by accident." Alternatively, a party may, as Mr. Griffin also does, bring a motion under rule 23B to remand for findings of fact not in the record that relate to an ineffective assistance of counsel claim. However, Mr. Griffin's motion under rule 23 does not implicate the concerns addressed in rules 11(h) or 23B.[4] He simply desires to augment the record for the benefit of arguments on appeal unrelated to his ineffective assistance of counsel claims. This is not permitted.[5] His request runs contrary to our traditional rule that "this court need not, and will not[,] consider *any* facts not properly cited to, or supported by, the record."[6] To

---

[3] For example, rule 23 provides the required content of a motion, the timing for response and reply, and the format and number of copies needed.

[4] In his rule 23 motion, Mr. Griffin asserts a claim of counsel's conflict of interest. This claim is more properly brought under rule 23B, and we therefore address that argument as it was raised in his rule 23B motion. *See infra* Part II.A.1.

[5] *Doctors' Co. v. Drezga*, 2009 UT 60, ¶ 5 n.3, 218 P.3d 598 ("[M]otions to supplement the record are inappropriate if used to introduce new material into the record." (internal quotation marks omitted)).

[6] *W. Jordan City v. Goodman*, 2006 UT 27, ¶ 33, 135 P.3d 874 (alteration in original) (internal quotation marks omitted); *see also*
(con't.)

allow parties to enlarge the record posttrial would eviscerate our longstanding rules of preservation and finality and open the door to never-ending litigation. We therefore deny Mr. Griffin's motion under rule 23.

## II. RULE 23B MOTION

¶ 14   Mr. Griffin also filed a motion under Utah Rule of Appellate Procedure 23B to remand the case to the trial court for findings bearing on his claims of ineffective assistance of counsel. A number of Mr. Griffin's 23B claims fail, and we therefore deny the motion in part. However, we determine that for several of his claims, Mr. Griffin has satisfied the requirements of rule 23B, and we therefore remand this case to the trial court on those claims.

¶ 15   In *Strickland v. Washington*, the United States Supreme Court articulated a two-part test to evaluate claims of ineffective assistance of counsel.[7] First, the burden is on the defendant to establish that "his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment."[8] Second, the defendant must show "that counsel's performance prejudiced the defendant," meaning that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[9]

¶ 16   A claim of ineffective assistance of counsel may be raised on appeal "if the trial record is adequate to permit decision of the issue."[10] Consequently, a defendant cannot bring an ineffective assistance of counsel claim on appeal without pointing to specific instances in the record demonstrating both counsel's deficient

---

UTAH R. APP. P. 57(a) (providing that the record on appeal consists of "the legal file, any exhibits admitted as evidence, and any transcripts").

[7] 466 U.S. 668, 687 (1984); *see Archuleta v. Galetka*, 2011 UT 73, ¶ 38, 267 P.3d 232.

[8] *Archuleta*, 2011 UT 73, ¶ 38 (internal quotation marks omitted).

[9] *Id.* ¶¶ 38, 40 (internal quotation marks omitted).

[10] *State v. Hopkins*, 1999 UT 98, ¶ 12, 989 P.2d 1065 (internal quotation marks omitted).

performance and the prejudice it caused the defendant.[11] Thus, where the record is silent regarding counsel's conduct, a defendant could not carry his or her burden of demonstrating deficient performance and resulting prejudice.[12] Unfortunately for defendants, however, the insufficient record may often be the result of the very inadequate assistance alleged.

¶ 17   Rule 23B was therefore "specifically designed to address the inadequate record dilemma."[13]   It provides a mechanism for criminal defendants to supplement the record with facts that are necessary for a finding of ineffective assistance of counsel but which do not appear in the record.  The rule states that "[a] party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel."[14]  Defendants face a high bar, however, because "[t]he motion shall be available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective."[15]

---

[11] Our appellate rules require citation to the record for each error alleged on appeal.  *See* UTAH R. APP. P. 24(a)(7) ("All statements of fact and references to the proceedings below shall be supported by citations to the record . . . ."); *id.* 24(a)(9) ("The argument shall contain the contentions and reasons of the appellant with respect to the issues presented, including the . . . parts of the record relied on."); *State v. Ison*, 2006 UT 26, ¶¶ 38–39, 135 P.3d 864 ("[C]laims of error cannot ordinarily be founded on matters not present in the record on appeal . . . .").

[12] *See State v. Litherland*, 2000 UT 76, ¶ 16, 12 P.3d 92 ("[W]here, on direct appeal, defendant raises a claim that trial counsel was ineffective[,] . . . defendant bears the burden of assuring the record is adequate.").

[13] *Id.* ¶ 14; *see also id.* ¶ 16 ("Where trial counsel's alleged ineffectiveness caused or exacerbated record deficiencies, defendants now have an appropriate procedural tool for remedying those deficiencies.").

[14] UTAH R. APP. P. 23B(a).

[15] *Id.*

And to support its contentions, the party must submit affidavits that demonstrate both the deficient performance by counsel and the resulting prejudice to the defendant.[16]

¶ 18 We have had little opportunity to consider rule 23B motions for remand, though our court of appeals has often addressed the issue.[17] In *State v. Johnston*, the court of appeals laid out a four-part test to evaluate rule 23B motions.[18] First, remand is not appropriate where the alleged facts are already in the record.[19] The purpose of a rule 23B remand is to develop new evidence in the record, without which a defendant cannot bring his ineffective assistance of counsel claim on appeal. But if the facts necessary for an ineffective assistance of counsel determination are apparent on the record, there is no need for a remand for additional findings, and the motion should be denied.[20]

¶ 19 Second, the defendant must provide allegations of fact that are not speculative.[21] "Speculation" is "mere guesswork or surmise," a "conjecture," or a "guess."[22] In the context of rule 23B, speculative allegations are those that have little basis in articulable facts but instead rest on generalized assertions. Permitting a remand for speculative allegations would not only "be inconsistent with the presumption of sound trial strategy, it would likely open a floodgate of incomplete and fragmented

---

[16] *Id.* 23B(b).

[17] *See, e.g., State v. Curtis*, 2013 UT App 287, 317 P.3d 968; *State v. Christensen*, 2013 UT App 163, 305 P.3d 222 (per curiam); *State v. Garrett*, 849 P.2d 578 (Utah Ct. App. 1993).

[18] 2000 UT App 290, ¶¶ 8–13, 13 P.3d 175.

[19] *Id.* ¶ 9.

[20] *State v. Alinas*, 2007 UT 83, ¶¶ 38–42, 171 P.3d 1046 (affirming that defendant "was not entitled to remand because the alleged omissions [were] apparent from the record" (alteration in original) (internal quotation marks omitted)).

[21] *Johnston*, 2000 UT App 290, ¶ 10.

[22] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2189 (2002).

ineffective assistance claims on direct appeal."[23] Thus, for example, the court of appeals has held that when a defendant seeks to admit evidence of photographs, tests, or reports, those documents must be included in the motion.[24] And when a defendant alleges that counsel failed to investigate or call a witness, the defendant must, at the very least, identify the witness.[25] It is therefore "improper to remand a claim under rule 23B for a fishing expedition."[26] The mere hope that an individual may be able to provide information if subpoenaed to testify is not sufficient. An affiant must submit specific facts and details that relate to specific relevant occurrences. As we discuss in greater detail below, however, we reject a strict rule suggested by the court of appeals in *Johnston* that the affidavit must come from the potential witness himself.[27] The court should consider all aspects of the allegation, not simply the identity of the affiant.

¶ 20 The third and fourth elements of the *Johnston* test come from the rule's mandate that the alleged facts "could support a determination that counsel was ineffective."[28] It stands to reason that if the defendant could not meet the test for ineffective assistance of counsel, even if his new factual allegations were true, there is no reason to remand the case, and we should deny the motion.[29]

---

[23] *State v. Hopkins*, 1999 UT 98, ¶ 13 n.1, 989 P.2d 1065 (internal quotation marks omitted).

[24] *Curtis*, 2013 UT App 287, ¶ 19; *Christensen*, 2013 UT App 163, ¶ 4.

[25] *Curtis*, 2013 UT App 287, ¶ 16.

[26] *Hopkins*, 1999 UT 98, ¶ 13 n.1 (internal quotation marks omitted).

[27] 2000 UT App 290, ¶ 11; *see infra* ¶¶ 27–28.

[28] UTAH R. APP. P. 23B(a); *accord Johnston*, 2000 UT App 290, ¶¶ 12–13 & n.1.

[29] *See Christensen*, 2013 UT App 163, ¶ 4 ("An appellant must present this court with the evidence he intends to present on remand and explain how that evidence supports both prongs of the ineffective assistance of counsel test." (internal quotation marks omitted)).

¶ 21   Ineffective assistance of counsel claims present a high hurdle for defendants.   In reviewing counsel's performance, appellate courts "must keep in mind the variety of circumstances faced by defense counsel [and] the range of legitimate decisions regarding how best to represent a criminal defendant."[30]  For this reason, we "indulge in the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."[31]  And even where a defendant can show deficient performance by counsel, the defendant must also demonstrate that he was prejudiced — "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[32]  In evaluating whether prejudice exists, we "consider the totality of the evidence, taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly the verdict is supported by the record."[33]

¶ 22   Finally, for the issues that we determine warrant remand under rule 23B, we express no opinion here as to the ultimate merits of the ineffective assistance of counsel claim.   Because the record is undeveloped and the State has had little opportunity to counter the factual allegations presented, it would be imprudent and contrary to the purposes of the rule to consider the merits of the claim at this stage of the proceeding.   Such a decision is best left for evaluation on appeal after the trial court has concluded its proceedings.   With these principles in mind, we turn to Mr. Griffin's allegations.

---

[30] *State v. Templin*, 805 P.2d 182, 186 (Utah 1990) (alteration in original) (internal quotation marks omitted).

[31] *Id.* (internal quotation marks omitted).

[32] *Id.*  at 187 (internal quotation marks omitted).

[33] *Id.*

*A. Remand Is Necessary to Supplement the Record Regarding
Mr. Griffin's Claims of Conflict of Interest, Failure to
Investigate a Witness, and Failure to Introduce
Evidence of Mr. Martinez's Burglary Conviction*

¶ 23 Upon review of Mr. Griffin's numerous allegations regarding ineffective assistance from counsel, we determine that three of his claims satisfy the requirements of rule 23B and therefore warrant remand to the trial court.

1. Counsel's Alleged Conflict of Interest

¶ 24 Mr. Griffin claims that one of his attorneys, Shannon Demler, had an actual conflict of interest while representing him. Mr. Demler represented Mr. Griffin in a limited capacity, appearing at trial only to cross-examine Mr. Britt, a fellow inmate who claimed to overhear incriminating statements Mr. Griffin made while in prison.

¶ 25 To support his rule 23B motion, Mr. Griffin submitted affidavits from his lead trial attorney, Randall Richards, and the lead investigator on the case, Scott Cosgrove. Detective Cosgrove stated that in 2006, Mr. Demler represented Frank Archuletta. Mr. Demler contacted the detective on behalf of Mr. Archuletta because he claimed to have information that would incriminate Wade Maughan[34] and Mr. Griffin in the murder of Mr. Perry. Detective Cosgrove explained that he met with Mr. Demler and Mr. Archuletta at the Utah State Prison, and Mr. Archuletta claimed he heard Mr. Maughan make statements while in prison that incriminated both him and Mr. Griffin. Mr. Archuletta expressed willingness to aid in the State's investigation and to appear as a witness for the State.

¶ 26 In his affidavit, Mr. Richards stated that he retained Mr. Demler to cross-examine Mr. Britt at trial because Mr. Richards and co-counsel had a conflict of interest with

---

[34] Mr. Maughan confessed to helping Mr. Griffin commit the murder. *State v. Maughan*, 2013 UT 37, ¶ 1, 305 P.3d 1058. The State charged both Mr. Maughan and Mr. Griffin with murder, but granted Mr. Maughan use immunity to testify against Mr. Griffin. *Id.* ¶¶ 4–5. Despite the grant of immunity, Mr. Maughan refused to testify at trial and was charged with obstruction of justice. *Id.* ¶ 7.

Mr. Britt. Mr. Richards asserted that he became aware that Mr. Demler had represented Mr. Archuletta and that Mr. Archuletta wanted to testify against Mr. Griffin and Mr. Maughan. Mr. Richards explained that when he retained Mr. Demler as Mr. Griffin's counsel, he "must have forgotten about his representation of [Mr.] Archuletta."

¶ 27 We conclude that Mr. Griffin's allegations that Mr. Demler had a conflict of interest satisfy the requirements of rule 23B and require remand for entry of factual findings. First, there is no mention of Mr. Archuletta or his association with Mr. Demler anywhere in the record. Second, the affidavits of Detective Cosgrove and Mr. Richards both supply nonspeculative allegations of a conflict of interest. The State argues that Mr. Griffin's failure to provide an affidavit directly from either Mr. Demler or Mr. Archuletta is sufficient to defeat his claim. We disagree. We recognize that in *Johnston*, the court of appeals adopted a strict rule for rule 23B affidavits. The court stated that, in addition to submitting affidavits identifying the witnesses and averring that they are able to testify, a defendant "must ordinarily submit affidavits *from the witnesses* detailing their testimony."[35] This requirement appears to represent an effort by the court of appeals to cut off the possibility of speculative allegations. However, we believe that requiring the potential witness to submit an affidavit himself goes too far. Nowhere does the text of the rule specify from whom the affidavit must be submitted. It is true that the identity of the affiant will almost certainly factor into the evaluation of whether the allegations are speculative. An affidavit from the witness himself, who presumably has firsthand knowledge, will almost always be less speculative than one from a third party. But we believe that the inquiry must focus on the content of the affidavit, not simply the identity of the affiant.

¶ 28 Such a requirement would also present practical problems for defendants who seek to bring legitimate, nonspeculative claims. It may often be the case that potential witnesses will be uncooperative with defendants who request

---

[35] *Johnston*, 2000 UT App 290, ¶ 11 (emphasis added); *see also Curtis*, 2013 UT App 287, ¶ 16 (denying motion because the potential witnesses did not provide affidavits detailing proposed testimony).

affidavits regarding possible past criminal activity. In such a situation, though a witness may have crucial information relating to the ineffectiveness of counsel, a defendant would have no means to compel the acquisition of relevant evidence. It is only through the subpoena power of the court that the needed testimony can be entered into the record. For this reason, we conclude that a defendant must have the opportunity to submit, and a court must consider, affidavits providing nonspeculative allegations from individuals other than the potential witness.

¶ 29 In this case, we conclude that the allegations contained in the affidavits from Mr. Richards and Detective Cosgrove are sufficiently nonspeculative. Their allegations are not the product of guesswork or conjecture, but are based on their firsthand knowledge and experience. They provide specific allegations regarding Mr. Demler's representation of Mr. Archuletta, Mr. Archuletta's proffer to the State, and Mr. Demler's involvement with Mr. Griffin's case.

¶ 30 Third, we conclude that the allegations, if true, could constitute deficient performance. If the trial court finds that Mr. Griffin has indeed demonstrated an actual conflict of interest,[36] then Mr. Demler's conduct violated Mr. Griffin's right to counsel.[37] Fourth, these allegations could support a determination that counsel's ineffectiveness prejudiced the result.[38] Remand to the trial court is therefore appropriate to supplement the record with facts related to Mr. Griffin's conflict of interest claim.

---

[36] "In order to establish an actual conflict, [the defendant] must demonstrate as a threshold matter . . . that the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests." *State v. Taylor*, 947 P.2d 681, 686 (Utah 1997) (alterations in original) (internal quotation marks omitted).

[37] *State v. Lovell*, 1999 UT 40, ¶ 22, 984 P.2d 382 ("The right to conflict-free representation is guaranteed by the Sixth Amendment.").

[38] *See Fernandez v. Cook*, 870 P.2d 870, 878 (Utah 1993) (noting that prejudice may be presumed "when counsel is burdened by a conflict of interest").

2. Counsel's Failure to Investigate Statements Made by Steven Wells

¶ 31  Mr. Griffin argues that his counsel provided ineffective assistance when they failed to investigate witnesses who told police that they saw Mr. Martinez, a primary suspect, with blood on his clothes the night of the murder.  In his affidavit, Detective Cosgrove named a possible eyewitness, Steven Wells, who claimed to have seen Mr. Martinez wearing a shirt covered in blood the night of Mr. Perry's murder.  Mr. Richards asserted in his affidavit that they did not investigate Mr. Wells or any of the other witnesses who claimed to have seen Mr. Martinez that night.  Ron Edwards, Mr. Griffin's private investigator, provided an affidavit stating that Mr. Wells was uncooperative but could be served with a subpoena.

¶ 32 Mr. Griffin identifies only one potential witness, Mr. Wells, but asserts that there are others who witnessed Mr. Martinez that night.  Allegations that counsel did not follow up with these additional unnamed witnesses fail because they are too speculative.  Mr. Griffin must at least be able to identify the potential witnesses.  However, his allegation that counsel did not investigate whether Mr. Wells possessed exculpatory information merits remand under rule 23B.  First, there is no evidence in the record that Mr. Martinez was seen on the night of the murder with blood on his clothes.  Second, the allegation is nonspeculative.  As discussed above, that Mr. Griffin could not secure an affidavit from an uncooperative Mr. Wells does not defeat his claim.  The affidavit of Detective Cosgrove supplies a specific allegation that an identifiable witness—Mr. Wells—provided evidence that implicated Mr. Martinez, a key suspect, in the murder.  And the affidavit of Mr. Richards confirms that he was aware of Mr. Wells's claims but declined to investigate them.

¶ 33 Third, we believe that the failure to investigate could constitute deficient performance because of the importance of the evidence.  In general, counsel has the "duty to adequately investigate the underlying facts of the case" because "investigation sets the foundation for counsel's strategic decisions about how to build the best defense."[39]  However, counsel is not

---

[39] *Menzies v. State*, 2014 UT 40, ¶ 132, __ P.3d __ (internal quotation marks omitted).

obligated to investigate every possible lead or present every theory of defense. We have explained that "[i]f counsel believes that pursuing certain investigations would be fruitless or harmful, we will not question that decision in the absence of a showing that counsel's belief was unreasonable."[40] But here, the eyewitness testimony that Mr. Martinez was wearing bloody clothes on the night of the murder is highly probative, particularly in light of other evidence implicating Mr. Martinez. We therefore conclude that it was unreasonable for counsel to believe that this lead was not worth investigating.

¶ 34 Finally, Mr. Griffin's allegations could support a determination that counsel's ineffectiveness prejudiced him. We have explained that "when trial counsel fails to reasonably investigate and present evidence that was crucial to the defense, it amounts to prejudice when this evidence would have affect[ed] the entire evidentiary picture."[41] We believe that evidence that another suspect was seen with blood on him the night of the murder could alter "the entire evidentiary picture" before the jury. Accordingly, we remand this issue to the trial court.

3. Counsel's Failure to Introduce Evidence that Mr. Martinez Burglarized Mr. Perry's Home

¶ 35 Mr. Griffin next alleges that counsel was ineffective for failing to introduce evidence that Mr. Martinez burglarized the home of Mr. Perry on the day of Mr. Perry's funeral. In 2000, Detective Cosgrove submitted a sworn affidavit to a district court to obtain a search warrant against Mr. Martinez. In his search warrant affidavit, the detective represented to the court that Mr. Martinez burglarized Mr. Perry's home on the day of Mr. Perry's funeral. He destroyed some of Mr. Perry's personal property and stole items from his room. Mr. Martinez was convicted for the offense. Mr. Griffin now includes that affidavit in his rule 23B motion to show that counsel was aware of the burglary but failed to introduce it at trial.

---

[40] *Fernandez*, 870 P.2d at 876–77.

[41] *Gregg v. State*, 2012 UT 32, ¶ 26, 279 P.3d 396 (alteration in original) (internal quotation marks omitted).

¶ 36 We determine that these allegations are sufficient for a rule 23B remand. First, there is no mention of the burglary in the record. Second, Mr. Griffin's allegations are nonspeculative. Mr. Griffin did not include a record of the burglary conviction in his motion, and while it is generally insufficient to merely point to the existence of omitted evidence without attaching it to the motion,[42] Mr. Griffin did include a sworn affidavit from Detective Cosgrove confirming that Mr. Martinez was convicted for the burglary. We conclude the allegations contained in the detective's affidavit are nonspeculative.

¶ 37 Third, Mr. Griffin could demonstrate that counsel rendered deficient performance. The affidavit from trial counsel does not address evidence of the burglary and thus does not explain whether the evidence was investigated or why it was not introduced. Generally, we "indulge in the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and thus we employ a presumption that "the challenged action might be considered sound trial strategy."[43] Therefore, where a defendant alleges that omitted evidence should have been introduced by counsel at trial, defendant's rule 23B motion must overcome the presumption that the omission was part of a reasonable trial strategy. It may be possible to overcome this presumption where trial counsel supplies an affidavit stating that the omission was the result of error or a failure to investigate, meaning that counsel affirmatively avers that the omission served no trial strategy. But where no such affidavit exists, the burden is on the defendant to show that the omission was so egregious that it could not possibly have been part of a sound trial strategy.

¶ 38 We conclude that this is a rare situation in which the defendant could show that an omission by trial counsel could

---

[42] *See Christensen*, 2013 UT App 163, ¶¶ 2, 4 (denying rule 23B motion for failing to include in the motion the medical records and insurance report that defendant sought to introduce into the record).

[43] *Templin*, 805 P.2d at 186 (internal quotation marks omitted).

have served no reasonable trial strategy.[44] Evidence that Mr. Martinez broke into the victim's house on the very day of Mr. Perry's funeral and damaged his personal belongings is probative of Mr. Martinez's possible involvement in the crime. This is particularly true given that police considered Mr. Martinez a primary suspect. We can see no reasonable strategy for omitting this evidence at trial.

¶ 39 Fourth, this allegation could support a determination that counsel's failure to elicit the evidence prejudiced Mr. Griffin. Evidence that another individual committed the crime is highly exculpatory, and when we "consider the totality of the evidence," the burglary evidence could have altered the outcome of the proceeding.[45] We therefore grant Mr. Griffin's rule 23B motion on the issue of Mr. Martinez's burglary, and remand to the trial court for the entry of findings.

### B. Remand Is not Necessary for Mr. Griffin's Remaining Allegations

¶ 40 Mr. Griffin brings numerous additional allegations that counsel rendered ineffective assistance. We address each in turn and determine that each claim fails.

### 1. Mitochondrial DNA

¶ 41 Mr. Griffin argues that his defense counsel did not investigate the unreliability of mtDNA evidence, did not retain an expert to educate themselves about the issue, and did not present expert testimony to rebut mtDNA testimony by the State's expert, Dr. Terry Melton.

¶ 42 It is not necessary to remand this issue for factual findings because sufficient evidence exists in the record to demonstrate that counsel's performance was not deficient. The record shows that in preparation for trial, Mr. Griffin's defense counsel did engage two experts—Todd Rigley, an expert in cellular and molecular biology, and Dr. Greg Hampikian, an expert in genetics. Additionally, Mr. Griffin's defense counsel

---

[44] *Fernandez*, 870 P.2d at 876 (explaining that trial strategy is not effective if there is "no reasonable basis for the decision" (internal quotation marks omitted)).

[45] *Templin*, 805 P.2d at 187.

challenged the conclusions of Dr. Melton through cross-examination. Utilizing cross-examination to expose defects in an expert's presentation can be a sound trial strategy.[46] As the Supreme Court has recognized, "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense."[47] In this case, defense counsel explicitly stated during a pretrial hearing to exclude the mtDNA evidence that his strategy was to focus on cross-examination of the State's expert.[48] Then, during trial, defense counsel cross-examined Dr. Melton on the very issues that Mr. Griffin now seeks to introduce: that mtDNA is maternally inherited, that the DNA database used had fewer than 5,000 samples, and that Dr. Melton's conclusion did not take into account population demographics for the relevant area of northern Utah. Therefore, there is no reason to remand to the trial court to enter findings on these challenges to the State's expert.

2. Mr. Britt's Identification of Mr. Griffin

¶ 43 Mr. Griffin argues that a remand is necessary to supplement the record with facts related to Mr. Britt's identification of Mr. Griffin. However, we determine that remand is not necessary on this issue. At trial, the State called Mr. Britt to testify that, while in jail, Mr. Britt overheard Mr. Griffin confess to the murder. However, at the beginning of the State's direct examination, Mr. Britt conceded that he could not identify Mr. Griffin in the courtroom and defense counsel objected to his testimony. The court acknowledged that Mr. Griffin looked substantially different at trial than he had in prison and therefore

---

[46] *See Harrington v. Richter*, 131 S. Ct. 770, 791 (2011) ("In many instances cross-examination will be sufficient to expose defects in an expert's presentation."); *Jones v. Suthers*, 130 Fed. App'x 235, 242–43 (10th Cir. 2005) (holding that counsel was not ineffective in calling a rebuttal expert because "[c]ounsel was able to cover the same ground in cross-examination that she would have if she had called her own expert witness").

[47] *Richter*, 131 S. Ct. at 791.

[48] Following cross-examination of Dr. Melton, defense counsel stated, "I think we covered everything on cross-examination that I would put on with [Dr.] Hampikian, so we rest."

ruled that Mr. Britt could testify if he could identify an older photo of Mr. Griffin from a photo lineup. Subsequently, and while Mr. Griffin was outside the courtroom, Mr. Britt did identify Mr. Griffin from the lineup, and he was allowed to continue his testimony. Mr. Griffin now argues that counsel was ineffective for failing to object to the identification process. Mr. Richards submitted an affidavit stating that when Mr. Britt left the witness stand after failing to identify Mr. Griffin in the courtroom, he was led "directly in front of [the defense] table" and he "look[ed] closely at Griffin as he passed."

¶ 44 Remand is unnecessary on this issue because the record reflects that Mr. Britt was on the witness stand and therefore had an opportunity to observe Mr. Griffin in the courtroom before the photo lineup. Thus, it is not necessary to supplement the record with additional facts that Mr. Britt stared at Mr. Griffin.

3. Blood on the One-Dollar Bill

¶ 45 Mr. Griffin claims that defense counsel inadvertently forgot to elicit testimony that because Mr. Griffin was a sheet metal worker in Logan, he frequently had cuts on his hands, which could have introduced his DNA onto the one-dollar bill. He also argues that counsel failed to present exculpatory evidence in the form of an expert opinion that there was no way to determine how or when Mr. Griffin's blood was transferred to the one-dollar bill.

¶ 46 At trial, Mr. Griffin called expert Dr. James Gaskill, who explained that "studies reveal that D.N.A. is easily transferred. And that very small quantities of D.N.A. can be analyzed and profiled, extremely small amounts . . . . It's touch D.N.A. That touch D.N.A. has been found on all sorts of surfaces." Dr. Gaskill further stated that "any cell that could get on this dollar bill could have D.N.A. on it." For this reason, he explained, bills are particularly "good candidates for D.N.A." because they "tend to absorb biological fluids." Dr. Gaskill also testified that he tested six bills he collected at random in the regular course of business, and from two of the bills he was able to detect the presence of DNA.

¶ 47 We conclude that Mr. Griffin has not shown that this allegation could support a determination that his counsel was ineffective. Trial counsel did provide the jury with expert testimony that DNA can easily be transferred to bills in the stream

of commerce. Thus, evidence that Mr. Griffin was a sheet metal worker would have been cumulative. Moreover, Mr. Griffin's argument that the blood was transferred at another time contradicts testimony by the students that the blood on the bill was damp when they received it from the suspect. As a result, the jury could discredit his argument altogether. We therefore determine that Mr. Griffin has not demonstrated that his allegation could support an ineffective assistance claim.

4. Vehicle at Crime Scene

¶ 48 Mr. Griffin next charges his counsel with failure to introduce evidence that his vehicle at the time of the murder did not match the vehicle observed at the Texaco gas station, but that the father of another possible suspect, Michael Caldwell, owned a car that did match. Mr. Griffin's argument fails because there is enough testimony regarding the vehicle on the record for this court to determine that counsel was not ineffective.

¶ 49 At trial, the vehicle at the gas station on the night of the murder was mentioned several times. Mr. Barish, one of the students, testified that he saw a white older-model pickup truck at the station—either a Ford or a Chevy brand. Detective Cosgrove later testified that a potential suspect, Mr. Caldwell, stated that he drove his father's truck—a 1960s pickup truck—to the Texaco gas station at about 11 p.m. with other suspects, and waited in the truck while the others entered the store. Defense counsel also reminded the jury of the detective's testimony about the truck during closing arguments, stating that Mr. Caldwell admitted "that he was there," and "that he drove a 1969 or '70 white pickup, which Ali Sabbah saw at the scene."

¶ 50 Mr. Griffin alleges that counsel should have also introduced evidence that he drove a black truck that did not match the description of the vehicle at the gas station. We conclude, however, that in light of the testimony provided, the evidence would have added nothing to improve the evidentiary picture. The jury heard that Mr. Caldwell claimed he drove a white pickup truck, matching the description from Mr. Barish, to the scene of the murder. We do not believe that additional testimony that Mr. Griffin's car was black would have added anything. Therefore, there is sufficient evidence in the record for us to conclude that defense counsel was not ineffective in failing to elicit additional information about the vehicle.

5. Additional Information About Other Suspects

¶ 51   Mr. Griffin next points to various sources providing numerous allegations that he claims constitute substantial evidence that others committed the murder.   We address them briefly here.

### A. Mr. Nager's Similarity to Gas Station Attendant

¶ 52   Mr. Griffin asks this court to remand to supplement the record with additional evidence that Mr. Nager matched a description of the man at the gas station.   However, there is sufficient evidence on the record for a determination that trial counsel did not perform ineffectively.   At trial, Detective Cosgrove stated that Mr. Sabbah identified Mr. Nager out of a photo lineup and said that he was "consistent with" the man from the gas station.   We determine that Mr. Griffin did not suffer prejudice for counsel's failure to introduce additional testimony that Mr. Nager looked like the man from the gas station.   Mr. Sabbah was a primary eyewitness in the case, and the defense elicited testimony that he had selected Mr. Nager out of a lineup.   Additional evidence that Mr. Nager fit the description of the station attendant therefore would have been cumulative.

### B. Mr. Nager Lied About His Location on the Night of the Murder

¶ 53   Mr. Griffin next alleges that counsel was ineffective for failing to introduce evidence showing that Mr. Nager lied to police about his whereabouts on the night of the murder.   This claim is based on a statement in Detective Cosgrove's affidavit that during his investigation he "became aware" of additional allegations, including that Mr. Nager "lied to police about his whereabouts around the time of the homicide."   We determine that this allegation is speculative.   Detective Cosgrove does not explain in the affidavit how he knows these facts, only that at some point he "became aware."   The detective also does not provide any additional details about where Mr. Nager claimed to be or where he actually was.   To satisfy the standard under rule 23B, Mr. Griffin must provide a more specific allegation.

### C. *Testimony of Michael Caldwell*

¶ 54  Mr. Griffin argues that it was error for defense counsel not to call Mr. Caldwell, who made numerous statements implicating Mr. Martinez and Mr. Nager,[49] to testify at trial. This claim fails, however, because at trial the parties stipulated that if called to testify, Mr. Caldwell would have invoked his Fifth Amendment right not to incriminate himself. Thus, Mr. Griffin cannot demonstrate ineffective assistance because Mr. Caldwell would not have testified even if called.

¶ 55  Moreover, in his affidavit, Mr. Richards explained that they decided not to call Mr. Caldwell for strategic reasons because they "believed he was not a credible witness." Detective Cosgrove affirmed this determination, testifying at trial that Mr. Caldwell's story changed numerous times. We have recognized that counsel's conduct is not unreasonable when he chooses not to call a potential witness whom he deems to be inconsistent and lacking credibility.[50] Such a witness represents an unknown for the defense, and counsel could reasonably believe that the testimony may prove more damaging than helpful. In this case, defense counsel elicited substantial testimony through Detective Cosgrove that Mr. Caldwell had implicated Mr. Nager and Mr. Martinez in the murder. And

---

[49] For example, at trial, Detective Cosgrove testified that Mr. Caldwell said that he drove Mr. Martinez in his family truck to the gas station because Mr. Nager wanted the clerk "dealt with." Mr. Caldwell stated that he waited outside while the two men were in the store, and when he entered the store later he saw blood everywhere. He did not know if Mr. Martinez killed Mr. Perry; he only "saw the mess afterwards."

[50] *See Fernandez*, 870 P.2d at 876 (explaining that "counsel's decision to call or not to call a certain witness" is a "strategic decision"); *see also Williamson v. Moore*, 221 F.3d 1177, 1181 (11th Cir. 2000) (finding no ineffective assistance for failure to call witness who made inconsistent statements about a murder because "a reasonable attorney could have decided not to call non-credible witnesses"); *United States v. Harden*, 846 F.2d 1229, 1232 (9th Cir. 1988) (holding that it was not ineffective assistance to decide not to call a witness whose credibility was at issue).

particularly where police also considered Mr. Caldwell to lack credibility, we cannot say that it was unreasonable for counsel to refrain from calling him and instead rely on the detective's testimony. We thus hold that counsel's performance was not deficient.

### D. Additional Evidence Implicating Others

¶ 56 Finally, Mr. Griffin points to additional allegations that he claims provide substantial evidence that another individual committed the crime. He alleges that, for example: Mr. Nager accused Mr. Martinez of the murder during a police interview but later changed his story; police thought the crime was committed with rage and Mr. Martinez fit the profile of an angry youth; police received information that Mr. Perry caught Mr. Martinez and Mr. Ritter burglarizing cars by the gas station; police had believed Mr. Nager and Mr. Martinez committed the crime until the DNA from the one-dollar bill matched Mr. Griffin; and police received information about two other possible suspects—Delmont Gentry and Glenn Dansey—who both wore tennis shoes, drove white pickup trucks, and allegedly bragged about a murder. Additionally, Mr. Griffin makes general allegations that "police and investigators were contacted by many witnesses and received numerous tips implicating Nager and Martinez." Mr. Griffin does not identify these witnesses, provide supporting affidavits, or indicate with any specificity what their testimony would be. We determine that each of these claims fails because the allegations are too speculative.

## CONCLUSION

¶ 57 We deny Mr. Griffin's motion under rule 23 as an improper means to supplement the record for appeal. We grant Mr. Griffin's rule 23B motion as to the claims of counsel's conflict of interest, the failure to investigate statements by Mr. Wells, and the failure to introduce evidence of Mr. Martinez's burglary of the victim's home. Therefore, under Utah Rule of Appellate Procedure 23B, we temporarily remand the case to the trial court to enter findings of fact on these claims. The trial court is to complete its proceedings within ninety days of the issuance of this order unless the trial court finds good cause for a reasonable delay. Mr. Griffin's direct appeal is stayed pending the trial court's proceedings.